NOTICE
Decision filed 12/30/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 220290-U

NO. 5-22-0290

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Effingham County. |
| | ) | |
| v. | ) | No. 21-CF-435 |
| | ) | |
| MICAH L. WARD, | ) | Honorable |
| | ) | Kevin S. Parker, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BARBERIS delivered the judgment of the court.
Justices Boie and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm the trial court's judgment where defendant failed to demonstrate that the court's failure to comply with Illinois Supreme Court Rule 431(b) constituted plain error, the court did not err by admitting video and audio recordings of defendant in custody or by allowing the jury to view and hear the recordings during deliberations, and defendant failed to establish a claim of ineffective assistance of counsel.

¶ 2    Following a jury trial in the circuit court of Effingham County, defendant, Micah L. Ward, was convicted of aggravated discharge of a firearm, unlawful possession of a weapon by a felon, and unlawful possession of firearm ammunition by a felon. The trial court sentenced defendant to a total of 10 years in prison, to be followed by one year of mandatory supervised release. Defendant appeals, arguing that (1) the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), (2) the court erred by admitting video and audio recordings of defendant in

custody, and (3) defense counsel provided ineffective assistance of counsel. For the following reasons, we affirm.

¶ 3                                    I. Background

¶ 4      We limit our recitation to those facts relevant to our disposition of this appeal. We recite additional facts in the analysis section as necessary to address defendant's specific arguments.

¶ 5      On November 15, 2021, the State charged defendant by information with aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2020)), a Class 1 felony, unlawful possession of a weapon by a felon (*id.* § 24-1.1(a)), a Class 3 felony, and unlawful possession of firearm ammunition by a felon (*id.*), a Class 3 felony.[1] In support of the unlawful possession charges, the State alleged that defendant had been convicted of a felony under the laws of Minnesota. The State subsequently obtained a grand jury's bill of indictment charging defendant with the same offenses. The charges stemmed from a shooting incident that occurred at a Motel 6 in Effingham, Illinois, on November 12, 2021.

¶ 6      On March 29, 2022, the matter proceeded to a jury trial. As a preliminary matter, defense counsel informed the trial court that he and the State "had informal conversations" regarding potential issues pursuant to *People v. Montgomery*, 47 Ill. 2d 510 (1971). Counsel explained that the State intended to present a certified copy of defendant's prior Minnesota conviction of "second degree assault" to "prove up the element of the convicted felon and the two [unlawful possession] charges and they are entitled to do that." Counsel understood that the State had no intention to use any other prior convictions for *Montgomery* purposes.

---

[1]The State additionally charged defendant with unlawful possession of a weapon by a felon while on parole (720 ILCS 5/24-1.1(a) (West 2020)), a Class 2 felony, and reckless discharge of a firearm (*id.* § 24-1.5), a Class 4 felony, but dismissed those charges prior to trial.

¶ 7    The trial court read the charges against defendant to the potential jurors, as set forth in the indictment. In doing so, the court stated that defendant had been "convicted of a felony under the laws of the State of Minnesota" and had been "convicted of a felony under the laws of Illinois."[2] The court advised the potential jurors that the charges in the indictment were "not to be considered by [the jurors] as evidence or creating any presumption of guilt against the Defendant Mr. Ward." The court clarified that the charges in the indictment were "simply the formal way that a charge is made and places a person on trial."

¶ 8    The trial court further advised the potential jurors that defendant was presumed innocent of all of the charges against him and that the presumption of innocence remained with him through all stages of his trial. The court advised that the State had the burden of proving defendant guilty beyond a reasonable doubt and that the law did not require defendant to prove his innocence.

¶ 9    Later in the jury selection process, the trial court admonished the venire as follows:

"I am going to read a couple of legal propositions. Some of which I touched upon already. And after I read them, I am simply going to ask if any one of you feel that you would find it difficult, perhaps even impossible, to follow these legal precepts.

Mr. Ward, the Defendant, is presumed innocent of the charges against him. Before he can be convicted, the State must prove Mr. Ward guilty beyond a reasonable doubt. Mr. Ward is not required to offer any evidence on his behalf. And if his failure to testify, if he fails to testify or chooses not to testify, that cannot be held against him.

Those are the legal precepts I need you to ponder and let me know if you have a problem following those precepts. And if so, please raise your hand."

---

[2]It appears that the trial court misspoke when it stated that defendant had been convicted of a felony under the laws of Illinois, as the indictment indicated that defendant had been convicted of a felony under the laws of Minnesota.

3

The court did not specifically ask the potential jurors if they understood and accepted the legal principles. Defense counsel did not object to the procedure followed by the court.

¶ 10    In response to specific inquiries during the jury selection process, prospective juror Baker stated that she had "heard [defendant's] name in the paper or on the news a few times in the past." When asked if what she had heard caused her to form an opinion as to defendant's guilt or innocence, prospective juror Baker responded, "Only like it sounds like he's been in trouble, you know." When the court asked if prospective juror Baker could not consider what she heard about defendant in serving as a juror, she responded, "I don't know." When the State later asked prospective juror Baker if she could be fair to both sides despite what she had heard about defendant, she responded, "I don't know. Like I said I don't know the facts of his case. I don't know." Prospective juror Baker added that she had "heard [defendant's] name in the paper in the past. Read it on the news, on the radio station, on the website, you know. And I am thinking I have heard his name several times in the past." When the State asked if she was "just unsure," prospective juror Baker responded, "Yeah." Prospective juror Baker was subsequently stricken for cause.

¶ 11    When defense counsel asked prospective juror Hille if she had any expectation as to what evidence she should hear in the case, she responded, "It would be nice to hear from [defendant]." Defense counsel reminded prospective juror Hille of the trial court's instruction that defendant had a right not to testify at trial and that defendant's decision not to testify could not be held against him. Defense counsel asked prospective juror Hille if she agreed with that principle of law, and she responded, "I would have to hear all the evidence first. I don't know." Prospective juror Hille agreed that she may "draw some inference" against defendant if he chose not to testify. Prospective juror Hille was subsequently stricken for cause.

4

¶ 12    When defense counsel asked prospective juror Sain if he presumed defendant to be innocent, he responded, "As of right now, yes." When asked if he would presume defendant innocent if he chose not to testify, prospective juror Sain responded, "I am not sure." Prospective juror Sain elaborated that defendant "would probably have the right to speak up on his behalf." Defense counsel reminded prospective juror Sain that defendant had the right to not testify and that it was inappropriate to draw inferences from defendant's silence. When defense counsel asked prospective juror Sain if he agreed with that law, he responded, "I understand it." When defense counsel again asked if he agreed with that law, he responded, "In theory." Prospective juror Sain further stated that he could apply that law if he was selected as a juror in the case. Counsel subsequently used a peremptory challenge to prospective juror Sain serving on the jury.

¶ 13    During opening statements, the State advised the jury it would prove that on November 12, 2021, defendant shot at several individuals on the second-floor balcony of a Motel 6. The State also advised the jury that it would prove defendant was not allowed to possess a firearm "because he was convicted of a felony from the State of Minnesota." The State also advised that defendant's possession of firearm ammunition was "illegal because he had a conviction out of the State of Minnesota for a felony." The State further advised that "the most important piece of evidence" was "surveillance footage from the Econo Lodge, which is now the Motel 6 located here off Fayette Avenue in Effingham." The State noted that the Motel 6 was a two-story, L-shaped motel and that the rooms were only accessible from the outside.

¶ 14    The State noted that the surveillance footage would show several men standing on the second-floor balcony when a male subject, who was wearing all red clothing, exited a motel room and discharged a firearm at the men standing on the balcony. The State further noted that the surveillance footage would show that the male subject briefly returned to a motel room before

5

exiting the room and fleeing down a stairwell at the motel with what appeared to be a gun in his hand. The State additionally noted that the evidence would show that defendant was located at a fitness center called "Zone Fitness" wearing all red shortly after the shooting incident took place at the Motel 6. In conclusion, the State asserted that its "main evidence [would] be security footage, from eye witness testimony[,] and then where [defendant] was later found and what he was wearing."

¶ 15    Autumn Schreier first testified for the State. Schreier met defendant in August 2021 and had been in a dating relationship with him "for a few months" prior to November 2021. She resided in the Motel 6 in Effingham, Illinois, in November 2021. Defendant would "come and go" from Schreier's hotel room. Defendant was "in and out" of Schreier's hotel room on November 12, 2021.

¶ 16    Benjamin Rohlfing next testified for the State. Rohlfing purchased the Motel 6 in 2021. The motel was previously an Econo Lodge and Rohlfing converted it into a Motel 6. Rohlfing installed a security system at the Motel 6, which included video cameras that automatically recorded upon the detection of motion. The cameras covered all common areas, walkways, and the parking lot. Rohlfing used the security system to monitor the motel, and he could access the recordings on his phone or computer. The recordings were all dated and time stamped. Rohlfing provided law enforcement with recordings from the motel from approximately 8 p.m. on November 12, 2021.

¶ 17    Bryce Ruholl next testified for the State. Ruholl was at the Zone the evening of November 12, 2021. While in the parking lot, a Black male approached Ruholl's vehicle and asked for a phone charger. The man had long dreadlocks and was wearing all red. Ruholl recalled that the man appeared "kinda distraught and nervous." Ruholl advised the man that the Zone had public phone

chargers, and the man went into the gym. The man advised Ruholl that he had been locked out of his hotel room at the Econo Lodge, which Ruholl knew to currently be a Motel 6. Ruholl advised a Zone employee of the individual and they agreed to "call it in." Ruholl clarified that he and the employee called the owner of the gym, who called law enforcement. Ruholl admitted that he was on probation for possession of a controlled substance at the time of defendant's trial.

¶ 18 Jason Gouchenouer testified for the State. Gouchenouer worked as a patrol officer for the city of Effingham. Gouchenouer was working the evening of November 12, 2021, into the early morning hours of November 13, 2021. During his shift, Gouchenouer was dispatched to the Zone after the gym owner called "saying that the suspect was in the gym." Law enforcement was "looking for an individual dressed in all red." Gouchenouer located defendant wearing all red at the Zone. Gouchenouer specified that defendant was wearing a red sweatshirt, red sweatpants, and black tennis shoes. Gouchenouer also observed that defendant had dreadlocks at that time, as well as "numerous facial tattoos." After locating defendant at the Zone, Gouchenouer escorted defendant to his squad car and drove defendant to jail.

¶ 19 Gouchenouer testified that his squad car had a camera that recorded the back seat area. The camera usually recorded in color but recorded in black and white in low light conditions. Gouchenouer identified a copy of his squad car video from the night of November 12, 2021 (People's exhibit No. 1). Gouchenouer agreed that a majority of the recording depicted an empty back seat and that there was only a brief period of time that defendant was seen on the recording. Gouchenouer identified defendant as the person depicted in the video, noting defendant's facial tattoos and "long dreadlock style hair." Gouchenouer further noted that at the end of the recording, defendant could be seen in color through the rear glass windshield wearing a red sweatshirt. The

State admitted into evidence a copy of Gouchenouer's squad car video without objection from defense counsel.

¶ 20 On cross-examination, Gouchenouer admitted that he assisted with the search of defendant's person but did not find any guns or ammunition on his person. Gouchenouer also admitted that no gunshot residue was found on defendant.

¶ 21 Ryan Holsapple next testified for the State. Holsapple was employed as a detective with the Effingham Police Department. He was dispatched to the Motel 6 on November 12, 2021, following reports of a shots fired incident. Once on scene, Holsapple found five spent, or fired, shell casings on the second-floor balcony of the motel between rooms 240 and 228. Holsapple additionally found bullet fragments in the same area. Holsapple also found one spent casing on the first-floor level directly below the casings located on the second story. Holsapple photographed the shell casings and bullet fragments he located at the scene. He identified the photographs he took, which were admitted into evidence at trial without objection. All of the spent shell casings were of the same caliber, "380 autos." Holsapple specified that five of the shell casings were from Blazer brand ammunition and one of the shell casings was from Remington brand ammunition.

¶ 22 Holsapple testified that he entered Schreier's motel room, which was room 238 of the motel, the evening of the shooting. According to Holsapple, Schreier consented to a search of the room. Inside of Schreier's room, officers located a gray duffle bag that contained a 50-count box of Blazer .380 ammunition, which had "42 new shells left" inside. Holsapple also discovered a spent Remington shell casing in the duffle bag. Holsapple confirmed that the ammunition found in the duffle bag was the same caliber and brand of ammunition as the spent shell casings recovered outside the motel. Photographs of the duffle bag and its contents were admitted into evidence at trial without objection, along with the actual spent shell casings and bullet fragments.

8

¶ 23    Holsapple testified that law enforcement searched the motel and surrounding area for a firearm but did not locate one. Holsapple did not test defendant's hands for gunshot residue following his arrest, stating that he "just didn't think about it at the time." Holsapple also did not order testing of the ammunition found in the duffle bag. Holsapple observed defendant at the Effingham County jail on November 12, 2021. Holsapple noted that defendant had "distinguishable tattoos on his face."

¶ 24    Holsapple testified that he also obtained consent from Schreier to search her cell phone. Holsapple took photographs of the screen of Schreier's phone, which depicted photographs of defendant. Holsapple identified defendant in the photographs because of the tattoos on his face. The photographs of Schreier's cell phone were admitted into evidence without objection.

¶ 25    Holsapple testified that he viewed video recordings from the Motel 6 from the evening of November 12, 2021. Specifically, he viewed the footage from approximately 7:45 p.m. to 8:15 p.m. Holsapple explained that the footage showed "the shooting incident." Holsapple obtained copies of the footage from the motel owner. He identified DVDs containing copies of the footage from various angles at the Motel 6 (People's exhibit Nos. 23, 24, and 25).

¶ 26    Holsapple testified that People's exhibit No. 23 depicted "the north of where the incident occurred pointing down the second[-]floor balcony." According to Holsapple, the footage depicted four male subjects "mill[ing] around out on the balcony for approximately ten, fifteen minutes *** having a conversation with each other." Holsapple explained that the footage then depicted a "[s]ubject wearing all red pop[ ] out of a doorway" and "fire shots with the firearm towards the people on the balcony." Holsapple believed that the subject fired shots because he could "see the flash of the muzzle a couple times in the video." Holsapple noted that one of the subjects on the balcony ran away from the shooter and that a piece of plastic fell down from the ceiling after it

9

was struck by a bullet. Holsapple recalled that he personally observed "a fresh hole on the ceiling plastic" when he conducted his investigation at the motel.

¶ 27    Holsapple testified that People's exhibit No. 23 next depicted the subject dressed in all red retreat into a motel room and exit the room a short time later. Based on his on-scene investigation, Holsapple was able to discern that the subject entered and exited room 238 after the shooting. After exiting the room, the subject ran north down a flight of stairs on the north side of the building away from the motel. Holsapple also identified People's exhibit No. 24 as motel footage that depicted the same version of events from the south camera of the motel.

¶ 28    Holsapple next identified People's exhibit No. 25 as motel footage that depicted the north stairwell of the motel. Holsapple explained that the footage depicted the subject, wearing all red, fleeing from his motel room and running towards the stairwell after the shooting incident. Holsapple added that a firearm was visible in the subject's hand. Holsapple additionally identified People's exhibit No. 26, which was a still frame photograph from the security footage. People's exhibit No. 26 depicted the subject running away from the motel room. Holsapple believed the subject depicted in the video footage and still frame was defendant based on defendant's red outfit and long hair. Holsapple testified that the Motel 6 was approximately one mile from the Zone.

¶ 29    Holsapple testified that he obtained a recording of a phone call between defendant and Schreier that took place on November 14, 2021, at the Effingham County jail. Holsapple made a copy of the recording, which he identified as People's exhibit No. 28. Holsapple testified that he searched "the Spillman system" and discovered that the phone number defendant dialed belonged to Schreier. Holsapple testified that defendant "mentioned something along the lines of he knew that there were cameras at the hotel" during the conversation.

10

¶ 30     When the State sought to admit People's exhibit No. 28 into evidence, defense counsel objected based on lack of foundation. Defense counsel argued that the foundation tendered was hearsay, especially the testimony that the phone number defendant dialed belonged to Schreier. The trial court stated, "At this juncture the Court is going to sustain the objection based on foundation." The court permitted the State to proceed with questioning to lay additional foundation.

¶ 31     Holsapple testified that the Effingham Police Department used the Spillman system as part of their regular business practices. The Spillman system logged all phone numbers and addresses of individuals who law enforcement came into contact with, including victims and witnesses. Holsapple obtained Schreier's phone number when he interviewed her at the motel. Holsapple obtained the recording of the phone call by searching for defendant's name.

¶ 32     During a sidebar, the trial court stated that it had no issue with the foundation for the jail call recording. The court also noted that the recording was probative. However, the court stated as follows:

> "My question, my problem is [it is] being used essentially as identification and I don't know what foundation has been laid to establish the voice on that recording as being Mr. Ward. His knowledge of certain instance, but we haven't even—the jury hasn't even seen a video yet of the man in the red outfit. And you know the person who could have authenticated his voice has already testified. That would have completely removed I think [defense counsel's] most of his—any of his foundational arguments.
>
> So I have got, I have got some concerns of this being used to show that Detective Holsapple can identify that voice of the recording as belonging to the Defendant. So there is my concerns.

11

I am going to allow additional questioning, but the parties will have to keep that in mind too."

¶ 33    After additional questioning by the State and argument by both parties, the trial court allowed defense counsel to cross-examine Holsapple before ruling on the admission of the jail phone call recording. Specifically, the court stated, "I am not going to rule one way or the other yet as to the admission of this exhibit until I've heard more and perhaps even an opportunity to let the parties make specific argument outside the presence of the jury after I've had an evening to sleep on it, because frankly I have got some real problems with the identification aspect of it." The court clarified that it was "not concerned about foundation."

¶ 34    On cross-examination, Holsapple testified that he prepared a written report regarding the recorded jail phone call. In his report, Holsapple indicated that most of the conversation heard on the recording was difficult to understand. Holsapple agreed that his report included quotations from the recording that stated, "they caught it on camera" and "you knew they had cameras." Holsapple agreed that his report did not include any mention of the Motel 6, a motel of any kind, or a shooting.

¶ 35    Holsapple testified on cross-examination that he did not observe any fingerprints on any of the shell casings he recovered from the motel. Holsapple did not test the box of Blazer ammunition found in the duffle bag for fingerprints. When asked if defendant's fingerprints were found on any of the evidence in the case, Holsapple responded, "No." When asked if "any forensic evidence recovered from room 238" showed that defendant had been in the room, Holsapple responded, "No." Holsapple testified that he had never performed a gunshot residue test on defendant. On redirect, Holsapple testified that he did not believe the duffle bag belonged to Schreier.

12

¶ 36    Jesse Wendt next testified regarding a .380 gun that was recovered during an unrelated traffic stop. Wendt was employed as a deputy with the Effingham County Sheriff's Office. After the Effingham Police Department received a disorderly conduct call regarding an individual named Isak McGivney threatening to shoot someone on December 27, 2021, Wendt initiated a traffic stop on a suspect vehicle that evening. Wendt located, among others, McGivney and Dylan Kaufmann in the vehicle. While speaking with the driver of the vehicle, Wendt located a gun in the parking lot 20 feet away from the vehicle. Wendt identified People's exhibit No. 29 as the gun she recovered in the parking lot. Wendt testified that the gun was a "Hi-Point CF 380 handgun." On cross-examination, Wendt testified that when she found the gun it was not loaded and had no magazine it.

¶ 37    Following Wendt's testimony, the State played the surveillance videos from the Motel 6 (People's exhibit Nos. 23, 24, and 25), along with the squad car video (People's exhibit No. 1) for the jury. Defense counsel objected to People's exhibit No. 1, arguing that the video of defendant in handcuffs was unduly prejudicial.

¶ 38    Dylan Kaufmann testified for the State. Kaufmann testified that he found a .380 "hard point" gun "behind the hotel like the woods" or "tree area." Kaufmann explained that he found the gun near the Comfort Suites hotel and the "Econo Lodge." When asked what he did with the gun, Kaufmann responded, "I mean I picked it up. I put it in my bag. Then later on that day or night, at night we got pulled over and then got caught with it." Kaufmann agreed that he had several pending charges, including possession of a stolen vehicle, possession of methamphetamine, unlawful sale of a firearm, mob action, and resisting a peace officer. Kaufmann agreed to testify at defendant's trial to obtain leniency from the State in his cases. Kaufmann confirmed that the gun he found behind the Comfort Suites was in the car when the car was stopped by police.

13

¶ 39    On cross-examination, Kaufmann testified that his girlfriend was with him when he found the gun. Kaufmann explained that he walked in that area "to get to the Econo because [his] girlfriend's brother stayed there at the time." Kaufmann explained that the pending charges stemmed from separate incidents. Kaufmann explained that he planned to sell the gun to McGivney.

¶ 40    Robin Brown next testified for the State. Robin worked as a deputy for the Effingham County Sheriff's Office and was co-owner of the Zone. Robin called Gouchenouer on November 12, 2021, after an employee of the Zone called him to report "a subject inside the gym that had given some of the customers an uneasy feeling and acting suspicious."

¶ 41    Joseph Kingery next testified for the State. Kingery worked at the Zone and also worked out at the gym. While working out at the Zone on November 12, 2021, Kingery noticed that a non-member of the gym walked in wearing red joggers and red shoes. Kingery recalled that the individual was a Black male who had "dreads." Kingery identified defendant as the individual he encountered at the Zone on November 12, 2021. Kingery recalled that defendant "seemed a little shaken up" and "a little nervous." Kingery recalled that defendant asked for a phone charger and advised that he was staying at "the Econo Lodge." After speaking with defendant, Kingery called Robin Brown and "let him know what was going on and that someone was at his business."

¶ 42    Tamara Bolyard testified for the State. Bolyard worked the front desk at the Motel 6 in November 2021. Bolyard was working the night shift at the front desk of the motel on November 12, 2021. Bolyard heard "firecrackers" and "saw somebody running" when she looked out the lobby window towards Room 238. Bolyard heard at least two firecracker sounds. Bolyard saw someone wearing a red shirt and red pants "[r]unning from one of the rooms, but running towards the stairs." Bolyard lost sight of the person when he ran into the stairwell on the second floor.

¶ 43    On cross-examination, Bolyard clarified that she did not see anyone else on the second floor when she looked out the lobby window. Bolyard testified that police arrived five minutes after she heard the loud firecracker sounds. Bolyard was the only person on duty that evening. When asked if she had seen the person she saw running before, Bolyard responded, "He had stayed out there before and that's the only time I saw him, but one time."

¶ 44    Seth Neal testified for the State. He worked at the front desk of the Motel 6 for approximately one year. Neal also lived in room 205 at the motel. On the evening of November 12, 2021, Neal heard what "sounded like fireworks" going off. Neal described "maybe one or two here and there and then *** three in quick succession." Neal recalled hearing "at least four or five" and "maybe six or seven" loud noises. Neal was unable to discern where the noises came from.

¶ 45    Steve Fehrenbacher testified for the State. He was employed as the evidence custodian for the Effingham Police Department and was so employed in 2021. Fehrenbacher transported various pieces of evidence in defendant's case to the Illinois State Crime Laboratory for further testing on January 19, 2022. The evidence included the gun Wendt recovered during the traffic stop, shell casings, and bullet fragments. Fehrenbacher retrieved the evidence from the lab on March 23, 2022.

¶ 46    Dustin Johnson testified for the State. Johnson worked for the Illinois State Police at the Morton Forensic Science Laboratory. Johnson was a forensic scientist who specialized in firearms identification. Regarding defendant's case, Johnson conducted testing on the gun, "fired cartridge cases," and bullet fragments. Johnson opined with a reasonable degree of scientific certainty that the cartridge casings had been fired by the gun Wendt recovered during the traffic stop of McGivney and Kaufmann. Johnson was unable to determine whether the gun fired the bullet or bullet fragments recovered from the scene.

15

¶ 47    Following Johnson's testimony, the trial court addressed the jail phone call recording (People's exhibit No. 28). The State indicated that it planned to call Sheriff's Deputy Matthew Brown to testify that defendant made the jail phone call. Defense counsel continued to object, arguing that "bringing in a Sheriff's Deputy to testify further about [defendant's] being in jail" would only draw more attention to defendant's incarceration. Defense counsel noted that the jury had already seen the video of defendant handcuffed in the squad car and heard testimony about the jail call system. Thus, counsel posited that the "incremental probative value" of the jail phone call recording was "far outweighed by the danger of unfair prejudice by highlighting the fact that [defendant] was in jail and drawing conclusions that they are discussing the matter at the motel." The court indicated that it would overrule defense counsel's objection to the admission of the jail phone call recording if the State presented Brown's testimony that defendant made the phone call.

¶ 48    Nathan Hill testified for the State. Hill was employed as a correctional officer with the Effingham County Sheriff's Department. Hill's job duties on November 12, 2021, were "to book and release people." Hill identified defendant as a person who was brought in for booking at approximately 10:20 p.m. on November 12, 2021. Hill recalled that defendant was wearing a red sweatshirt, red pants, and dark-colored shoes when he was brought in for booking. Hill further recalled that defendant had dreadlocks at the time of booking. Hill explained that defendant wore a different hairstyle at the time of trial, but Hill was able to recognize defendant's face.

¶ 49    Eric Loy next testified for the State. Loy was employed at the jail at the Effingham County Sheriff's Office. Loy identified defendant as a person he encountered at the jail in November 2021. Loy recalled that defendant was wearing red when he was brought into the jail. Loy provided defendant with standard jail issue clothing. Loy collected defendant's red clothing and placed it in

a property bag in the property room. The Effingham Police Department later came to the jail and collected defendant's red clothing.

¶ 50 The State next called Matthew Brown. Matthew Brown testified that he was employed as a correctional officer with the Effingham County Sheriff's Department. Brown testified that he witnessed phone calls made by the inmates. Brown identified defendant in court and testified that he observed a phone call between defendant and Schreier at approximately 2:15 p.m. on November 14, 2021. Brown explained that he sat at the booking desk approximately three feet away from defendant when defendant made the phone call. Brown notified Detective Holsapple about the call defendant made. Brown identified People's exhibit No. 28 as the phone call he observed on November 14, 2021. Brown listened to the recording of the phone call and identified two participants. Brown identified Schreier as the other phone call participant after he observed multiple visits between Schreier and defendant. The trial court then admitted People's exhibit No. 28 into evidence over defense counsel's objection, and the audio recording was played for the jury.

¶ 51 The trial court then advised the jury as follows:

"So the first thing I want to do, the parties have stipulated to the admission into evidence of State's Exhibit 32 for the record. That is a certified copy of a conviction against the Defendant Mr. Ward for the offense of assault in the second degree that being a felony in the State of Minnesota. That is admitted into evidence and is evidence for you to consider in this case."

The certified copy of defendant's conviction for assault in the second degree also referenced additional charges against defendant.

¶ 52 The State recalled Holsapple to testify. Holsapple identified a photograph of an aerial map depicting of a portion of Effingham (People's exhibit No. 33). Holsapple was familiar with

17

Effingham and the portion depicted in People's exhibit No. 33. Holsapple noted on the map where the Motel 6 was located in relation to the Zone and confirmed his prior testimony that the distance between the two was approximately one mile. Holsapple also identified another photograph of an arial map depicting the Comfort Suites and Motel 6 (People's exhibit No. 34). Holsapple testified that the Comfort Suites was only "a couple hundred feet" away from the Motel 6.

¶ 53   Following the State's evidence, defense counsel moved for a directed verdict, which the trial court denied. Defendant elected not to testify and defense counsel elected not to present any additional evidence. Defense counsel also advised the court that he had conferred with defendant and they had agreed not to ask for Illinois Pattern Jury Instruction 3.13X (Illinois Pattern Jury Instructions, Criminal, No. 3.13X (4th ed. 2000)), which provided an instruction regarding defendant's prior conviction in Minnesota. Specifically, the instruction provided as follows:

"Ordinarily, evidence of a defendant's prior conviction of an offense may not be considered by you as evidence of his guilt of the offense with which he is charged.

However, in this case, because the State must prove beyond a reasonable doubt the proposition that the defendant has previously been convicted of assault in the second degree under the laws of Minnesota, you may consider evidence of defendant's prior conviction of the offense of assault in the second degree under the laws of Minnesota only for the purpose of determining whether the State has proved the propositions as it relates to the offense of unlawful possession of a weapon by a felon and unlawful possession of firearm ammunition by a felon."

Accordingly, this instruction was not given to the jury.

¶ 54   During closing arguments, the State asserted that defendant "discharged a firearm in the direction of another person, possessed a firearm after being convicted of a felony and possessed

18

firearm ammunition." The State played People's exhibit No. 23—one of the surveillance video recordings of the second-floor balcony during the shooting incident. The State noted that the video depicted "a man wearing all red" shooting at a man in a gray shirt on the second-floor balcony of the Motel 6. The State highlighted that law enforcement recovered shell casings and bullet fragments from the Motel 6. The State noted Schreier's testimony that defendant was at her hotel room at the Motel 6 on November 12, 2021, and that the evidence showed that the shooting occurred near Schreier's room. The State further noted that witnesses identified defendant as the person they observed wearing all red at the Zone shortly after the shooting. The State noted that the witnesses indicated that defendant advised he was staying at the Econo Lodge, but the State explained that the Econo Lodge had been recently converted into a Motel 6. The State noted that additional surveillance footage and a still frame photograph taken of the footage depicted a man with dreadlocks wearing all red run towards the motel stairwell with an object in his hand that resembled a gun. The State further noted that defendant was wearing all red when he was apprehended by law enforcement at the Zone.

¶ 55    The State asserted that the evidence demonstrated that defendant dropped the gun used in the shooting in a grove of trees behind the Comfort Inn near the Motel 6 on his way to the Zone. The State noted Johnson's testimony that the gun was tested and found to match the shell casings recovered from the scene of the shooting.

¶ 56    The State then asserted the following:

> "Then you also have and I don't want to dwell on it too much, that call between Autumn and the Defendant where I believe Autumn says something along the lines of you knew the hotel had cameras. Essentially the defendant acknowledges that. Now it's unclear of what it was. The incident was. But we are again talking about Autumn Schreier who has

19

a hotel room there and her boyfriend had been there that day. So you can draw the inference that they are talking about the incident and the Motel 6. So for those reasons it's clear that it's the defendant who fired the shots."

¶ 57    In addressing the charge of unlawful possession of a weapon by a felon, the State noted that it was required to prove that defendant knowingly possessed a firearm and that he had been previously convicted of the offense of aggravated assault in the second degree. Regarding defendant's prior conviction, the State noted that People's exhibit No. 32 was a court record from Minnesota which showed defendant was convicted of the offense of assault in the second degree in Minnesota. In addressing the charge of unlawful possession of firearm ammunition by a felon, the State noted that it had to prove that defendant knowingly possessed firearm ammunition and that he had been previously convicted of the offense of assault in the second degree.

¶ 58    Defense counsel's closing argument focused on the lack of physical evidence connecting defendant to the shooting and the hotel room where Schreier was staying. Defense counsel noted that Holsapple failed to test defendant for gunshot residue following his arrest. Defense counsel's closing argument also addressed, *inter alia*, the jail phone call audio recording. Counsel noted that Holsapple "described the phone call from the jail and he said they were talking about, it was [defendant] and his girlfriend and they were talking about the shooting at the Motel 6 and about how it was on video." Counsel then stated as follows:

"Well I said well hey wait a minute. You wrote a report on this. Doesn't say anything about Motel 6. Doesn't say anything about a shooting. Well okay fair enough. And then we play—then they actually play the audio of it and it doesn't. It doesn't say anything about the Motel 6 and doesn't say anything about a shooting or a gun. Or where's the gun? What did you do with the gun? You know, did you get hurt? Nothing like that."

¶ 59    In response, the State asserted that the surveillance footage depicted defendant shooting a gun towards unknown individuals on the second-floor balcony. The State noted that the still frame photograph depicted defendant holding what appeared to be a gun in his hand as he ran towards the stairwell. The State noted that even if the unknown individuals "were up to no good," defendant was "not allowed to possess a firearm because he's been convicted for this offense of assault in the second degree."

¶ 60    In instructing the jury, the trial court stated, *inter alia*, as follows:

"You have before you evidence that the Defendant made statements related to the offenses charged in the Indictment. It is for you to determine whether the Defendant made the statements and if so, what weight should be given to these statements. In determining the weight to be given to the statement, you should consider all the evidence or circumstances rather under which it was made."

¶ 61    During deliberations, the jury sent a note to the trial court indicating that "[t]he jury would like to hear the phone call evidence again" with the volume increased. The jury also wanted to view "the patrol car surveillance *** starting when the Defendant enters the vehicle." Defense counsel objected to the jail phone call, noting his previous objection "[i]n part on prejudice grounds." Counsel noted that playing the phone call "again for the jurors would further compound that prejudice." Counsel also noted that the video of defendant in the squad car lacked probative value and was prejudicial in that it focused on defendant being detained in handcuffs. The court allowed the jurors' request over defense counsel's objections. Following deliberations, the jury found defendant guilty of all three counts.

¶ 62    On May 9, 2022, defense counsel filed a motion for acquittal, or in the alternative, a motion for a new trial, arguing, *inter alia*, that the trial court erred by admitting People's exhibit No. 28

into evidence at trial, by permitting the jury to view People's exhibit No. 1 during deliberations, and by permitting the jury to hear People's exhibit No. 28 during deliberations.

¶ 63    Also on May 9, 2022, following a hearing, the trial court denied the motion for a new trial and sentenced defendant to concurrent sentences of 10 years for aggravated discharge of a firearm, 5 years for unlawful possession of a weapon by a felon, and 5 years for unlawful possession of firearm ammunition by a felon.

¶ 64    On May 10, 2022, defense counsel filed a motion to reconsider sentence, which the trial court denied. Defendant filed a timely appeal.

¶ 65                                II. Analysis

¶ 66    On appeal, defendant argues that (1) the trial court failed to comply with Illinois Supreme Court Rule 431(b), (2) the trial court erred by admitting into evidence the video and audio recordings of defendant in custody, and (3) he received ineffective assistance of counsel. We address defendant's contentions in turn.

¶ 67                                A. Rule 431(b)

¶ 68    Defendant first argues that this court should grant him a new trial where the trial court failed to comply with Illinois Supreme Court Rule 431(b). Defendant acknowledges that defense counsel failed to object at trial and raise this issue in the motion for new trial and, thus, he concedes that he forfeited review of this issue. See *People v. Sebby*, 2017 IL 119445, ¶ 48 (failure to object to the error at trial and raise the error in a posttrial motion results in forfeiture). Defendant requests that this court review the issue under the plain error doctrine, arguing that the evidence in the present case was closely balanced. The State argues that the evidence was not closely balanced and that the trial court's failure to comply with Rule 431(b) did not constitute plain error. We agree with the State.

¶ 69    A reviewing court may consider a forfeited issue under the plain error doctrine

"(1) when 'a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error,' or (2) when 'a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *Id.* (citing *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007), quoting *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)).

"The initial analytical step under either prong of the plain error doctrine is determining whether there was a clear or obvious error at trial." *Id.* ¶ 49 (citing *Piatkowski*, 225 Ill. 2d at 565).

¶ 70    Rule 431(b) provides as follows:

"The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.

The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

Rule 431(b) "mandates a specific question and response process." *People v. Thompson*, 238 Ill. 2d 598, 607 (2010). "The trial court must ask each potential juror whether he or she understands and

23

accepts each of the principles in the rule" and provide "an opportunity for a response from each prospective juror on their understanding and acceptance of those principles." *Id.*

¶ 71 Here, contrary to defendant's claim that the trial court did not address all four principles, the record shows that the trial court advised the potential jurors of the four principles set forth in Rule 431(b). Notably, the court stated the following to the potential jurors:

"Mr. Ward, the Defendant, is presumed innocent of the charges against him. Before he can be convicted, the State must prove Mr. Ward guilty beyond a reasonable doubt. Mr. Ward is not required to offer any evidence on his behalf. And if his failure to testify, if he fails to testify or chooses not to testify, that cannot be held against him."

However, we agree with defendant that the trial court did not specifically ask the potential jurors if they understood and accepted the four principles. The State notes that the court did ask the potential jurors to "ponder" the principles and advise the court if they had "a problem following those precepts." However, the State concedes that the procedure followed by the court did not fully comport with the "specific question and response process" contemplated by Rule 431(b). See *Thompson*, 238 Ill. 2d at 607; see also *People v. Wilmington*, 2013 IL 112938, ¶ 32 (noting it was "arguable that the court's asking for disagreement, and getting none, [was] equivalent to juror *acceptance* of the principles," but concluding that the "court's failure to ask jurors if they *understood* the four Rule 431(b) principles [was] error" (emphases in original)). Accordingly, the State seemingly concedes, and we agree, that the court clearly erred by failing to comply with Rule 431(b).[3]

---

[3]We acknowledge defendant's claim that "the trial court's failures were highlighted by" statements made by prospective jurors Hille and Sain during *voir dire* indicating they would have difficulty putting aside defendant's decision not to testify at trial. However, we note that prospective jurors Hille and Sain were eliminated from the jury pool as a result of their statements and, thus, those jurors had no impact on the proceedings. We also acknowledge and reject defendant's claim that the jury was tainted because the entire jury pool heard the statements made by prospective jurors Hille and Sain, where no other juror

24

¶ 72    Where, as here, defendant claims first-prong plain error, this court must next "decide whether the defendant has shown that the evidence was so closely balanced the error alone severely threatened to tip the scales of justice." *Sebby*, 2017 IL 119445, ¶ 51 (citing *Herron*, 215 Ill. 2d at 187). "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Id.* ¶ 53.

¶ 73    Here, after conducting a commonsense assessment of the evidence, we conclude that the evidence against defendant was not closely balanced. Several witnesses testified to hearing firework or firecracker sounds at the Motel 6 on the evening of November 12, 2021. Witness testimony also established that law enforcement recovered shell casings and bullet fragments from the second-floor balcony and surrounding area on November 12, 2021. Moreover, video surveillance from the Motel 6 the evening of November 12, 2021, depicted several men standing on the second-floor balcony when a Black male with long hair wearing all red clothing emerged from room 238 and opened fire on the men standing on the second-floor balcony. Video surveillance further depicted the shooter retreat into a hotel room. Holsapple testified that, based on his investigation, he determined that the shooter entered room 238—defendant's girlfriend's, Autumn Schreier's, motel room. In fact, Schreier testified that she was in a dating relationship with defendant at the time of the shooting, and that defendant was at her hotel room on November 12, 2021. Holsapple and Schreier testified that Schreier was staying in room 238 on November 12, 2021. Video surveillance also depicted the shooter reemerge from that room a short time later and flee down the north stairwell. A still frame photograph of the video surveillance near the north

expressed similar views to those of Hille and Sain. In addition, we agree with the State that the present case is factually distinguishable from *Mach v. Stewart*, 137 F.3d 630 (9th Cir. 1997). We note that defendant forfeited review of this issue and claims that the issue is reviewable under the first prong of the plain error doctrine. Accordingly, our analysis follows defendant's argument in that regard.

stairwell depicted the shooter with long hair and all red clothing holding what appeared to be a gun in his hand. This evidence overwhelmingly established that a shooting took place on the second-floor balcony of the Motel 6, and also placed defendant at the Motel 6 on the day of the shooting.

¶ 74 Law enforcement recovered a duffle bag from room 238—defendant's girlfriend's motel room—which contained a box of Blazer .380 ammunition and one Remington brand shell casing— the same caliber and brand of spent shell casings law enforcement recovered from the balcony and surrounding area of the motel. Law enforcement noted that eight cartridges were missing from the Blazer ammunition box found in the duffle bag. Holsapple testified that the duffle bag did not belong to Schreier.

¶ 75 Several witnesses testified that shortly after the shooting, they observed defendant at the Zone wearing all red clothing. Defendant was also observed to have longer dreadlock-style hair. Witnesses testified that defendant appeared "distraught," "nervous," and "a little shaken up." Defendant advised the witnesses that he was staying at the "Econo Lodge." The evidence demonstrated that the Econo Lodge had recently been converted into a Motel 6. Testimony from law enforcement established that defendant was found wearing all red at the Zone and placed under arrest. Holsapple testified that the Zone was approximately one mile from the Motel 6. This evidence demonstrated that defendant was found in clothing that matched the clothing the shooter was wearing at the Zone, which was approximately one mile from the Motel 6.

¶ 76 In addition, the evidence demonstrated that law enforcement recovered a Hi-Point CF 380 handgun during an unrelated traffic stop. One subject of the traffic stop, Kaufmann, testified that he found the firearm in the "tree area right behind the Comfort Suites." Holsapple testified that the Comfort Suites was only "a couple hundred feet" away from the Motel 6. Evidence demonstrated

26

that the location where the subject discovered the firearm was near the exit of the north stairwell of the hotel—the area where the shooter fled the motel after the shooting. Johnson determined to a reasonable degree of scientific certainty that the spent shell casings found on the second-floor balcony were fired from the Hi-Point CF 380 handgun. From this evidence, it could reasonably be concluded that defendant dropped the gun in the woods when he fled the Motel 6 after the shooting.

¶ 77　　Based on our review of the record, we conclude that the evidence against defendant, although circumstantial, was overwhelming. We further note that the potential jurors were advised of all four principles required under Rule 431(b), and defense counsel was afforded the opportunity to question each prospective juror. For these reasons, defendant has failed to show that the trial court's failure to strictly comply with the requirements of Rule 431(b) constituted plain error in this case. Thus, we honor defendant's procedural default.

¶ 78　　　　　　　　　　　　B. Evidence of Defendant in Custody

¶ 79　　Defendant next argues that the trial court erred by admitting into evidence the video and audio recordings of him in custody (People's exhibit Nos. 1 and 28). Specifically, defendant argues that the court erred by (1) allowing the State to admit and publish the video recording of defendant sitting in the back seat of a police squad car with his arms handcuffed behind his back (People's exhibit No. 1), (2) overruling defense counsel's objection to admit and publish the audio recording of the alleged jail call between defendant and Schreier (People's exhibit No. 28), and (3) overruling defense counsel's objection to allow the jury to hear the audio-recorded jail call and watch the video-recorded back seat squad car surveillance footage during deliberations. The State argues that the court did not abuse its discretion by admitting the recordings into evidence. We agree with the State.

¶ 80    Evidentiary rulings are within the sound discretion of the circuit court and will not be reversed absent an abuse of discretion. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). An abuse of discretion will be found only where the circuit court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the court. *Id.* (citing *People v. Illgen*, 145 Ill. 2d 353, 364 (1991)).

¶ 81    "Generally, evidence is relevant and admissible if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " *People v. Epstein*, 2022 IL 127824, ¶ 20 (quoting Ill. R. Evid. 401 (eff. Jan. 1, 2011)). " 'Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.' " *Id.* (quoting Ill. R. Evid. 403 (eff. Jan. 1, 2011)). It is the jury's function " 'to assess the credibility of witnesses, weigh the evidence presented, resolve conflicts in the evidence, and draw reasonable inferences from the evidence.' " *People v. Ward*, 2011 IL 108690, ¶ 34 (quoting *People v. Moss*, 205 Ill. 2d 139, 164 (2001)). "To perform its function properly, the jury must be given as much relevant, admissible evidence as possible." *Epstein*, 2022 IL 127824, ¶ 21 (citing *Ward*, 2011 IL 108690, ¶ 34). "Without that evidence, the reliability of the jury's verdict may be called into question." *Id.* (citing *Ward*, 2011 IL 108690, ¶ 34). Our supreme court has stated that, "by its plain terms, Rule 403 provides for exclusion of relevant evidence only if its probative value is *substantially* outweighed by the risk of unfair prejudice." (Emphasis in original). *Id.* ¶ 22 (citing Ill. R. Evid. 403 (eff. Jan. 1, 2011)).

¶ 82    Here, we cannot say that the trial court's rulings were arbitrary, fanciful, or unreasonable so as to constitute an abuse of discretion. Regarding the squad car video, it is clear that the video

28

was relevant to an issue in this case—namely the identity of the shooter. Video surveillance from the motel depicted a man with long hair and all red clothing emerge from room 238 and begin shooting at several individuals standing on the second-floor balcony. Video surveillance from the motel also depicted a man with dreadlocks wearing all red clothing fleeing from the motel down the north stairwell. Witness and law enforcement testimony established that defendant was apprehended at the Zone, which was approximately one mile from the Motel 6, wearing all red clothing. Witness testimony also established that defendant had dreadlocks when he was apprehended at the Zone. The squad car video depicted defendant with facial tattoos and long, dreadlock-style hair, a different hairstyle than that worn by defendant at the time of trial. The squad car video later depicted defendant wearing a red sweater when he exited the squad car. Accordingly, this evidence allowed the jury to compare the surveillance footage from the motel to the footage from the squad car and determine if defendant was the individual in both recordings.

¶ 83    Despite this, defendant maintains that the probative value of the squad car video was outweighed by the prejudice that resulted from the jury viewing him handcuffed in the back seat of a police squad car. As the State correctly notes, defendant cites case law that stands for the proposition that "compelling a criminal defendant to stand trial before a jury while wearing the distinctive jail or prison attire undermines the presumption of innocence and might thus violate the defendant's right to a fair trial." We agree with the State that the case law cited by defendant on this subject is irrelevant where defendant did not appear in court wearing jail attire, handcuffs, or shackles in the present case. We further agree with the State that "[t]he prejudicial impact of a defendant appearing in person at trial handcuffed or shackled is significantly greater than the viewing of a video depicting a defendant in restraints immediately upon his or her arrest."

¶ 84    In support of his argument, defendant cites *People v. Schaefer*, 217 Ill. App. 3d 666 (1991). In *Schaefer*, the defendant argued that the admission of a videotape recording of the search of his house and arrest was irrelevant and prejudicial, "and that it deprived him of his presumption of innocence by showing him in handcuffs being read his *Miranda* rights and remaining silent despite his mother's pleas to confess or deny his guilt." *Id.* at 671. This court rejected the defendant's argument that the recording destroyed the presumption of innocence, agreeing with the trial court's determination that "the tape was relevant to the question of the thoroughness of the search" and that "the image of the defendant in handcuffs was not unduly prejudicial." *Id.* In doing so, this court concluded that "[a] brief, unaggravated viewing of the defendant in handcuffs was not so prejudicial as to deprive the defendant of a fair trial." *Id.* This court further noted that "the jurors were instructed by the trial court on the presumption of innocence" and presumed "they followed that instruction." *Id.* However, this court did conclude that the scenes of the defendant remaining silent throughout his arrest, including the reading of his *Miranda* rights, and the scenes depicting his mother's comments were "potentially prejudicial." *Id.* As a result, this court concluded that the admission of those specific scenes was prejudicial error and, thus, this court directed that those scenes be redacted prior to the recording being shown to the jury on retrial. *Id.*

¶ 85    Contrary to defendant's argument that "the backseat video-recording was not a brief or unaggravated viewing of [him] in handcuffs," we conclude that the squad car recording was indeed a brief, unaggravated viewing of him in custody. The recording depicted defendant sitting silently in the back of the patrol car for approximately seven minutes. Moreover, unlike *Schaefer*, the recording did not include any scenes depicting defendant being read his *Miranda* rights or a third party requesting defendant to confess or deny his guilt. In addition, as in *Schaefer*, the jurors were instructed by the trial court on the presumption of innocence, and we presume they followed that

30

instruction. Thus, we reach the same conclusion to that reached in *Schaefer*—the "brief, unaggravated viewing of the defendant in handcuffs was not so prejudicial as to deprive the defendant of a fair trial." *Id.* Accordingly, we conclude that the trial court did not abuse its discretion by admitting the squad car recording into evidence.

¶ 86    Regarding the recording of the jail phone call, we agree with the State that the audio recording was relevant in that it tended to establish defendant's consciousness of guilt. We note that, unlike the squad car video, the jail phone call recording did not depict or display to the jury defendant in handcuffs, as it was only an audio recording. While certain portions of the recording are difficult to discern, several portions are relatively clear. As the State correctly notes, Schreier is heard saying "that shit is crazy bro, I don't know what happened *** and why it happened." Schreier then stated "came in the room" and "I wish none of that fight woulda broke out *** now I gotta worry about how long you gonna be gone *** raise the kids by myself." Defendant then states that they "got that shit on camera," and Schreier responds, "you knew the hotel had cameras." Defendant then replies, "yeah I know." While defendant and Schreier did not explicitly reference the Motel 6 or a shooting in their conversation, we conclude that the jury could have reasonably interpreted the phone call in that manner.

¶ 87    In support of this conclusion, we find instructive the State's citation to *United States v. Johnson*, 624 F.3d 815 (7th Cir. 2010). In *Johnson*, the defendant argued that the district court erred by allowing the Government to play recordings of telephone calls he made in jail, claiming that "the calls unfairly prejudiced him by putting the jury on notice that he was incarcerated" and that the calls were "irrelevant to the issues presented by the case." *Id.* at 820. The Seventh Circuit initially noted that "[t]he Government offered the recordings as evidence of [the defendant's] consciousness of guilt, which [was] an appropriate basis for admitting evidence of threats." *Id.* The

defendant asserted that the recordings did not contain any explicit threats to the informant in the case and that interpreting the recordings in such a way "would require too much speculation." *Id.* at 820-21. The Seventh Circuit acknowledged that "the recorded conversations in question may not have had anything to do with threatening or intimidating the informant" where the conversations "ostensibly concern[ed] [the defendant's] attempt to sell a car to somebody." *Id.* at 821. The Government posited that "one could easily conclude that [the defendant's] vague references to selling the informant a car because that [would] help [the defendant] 'get out of here' [were] coded suggestions that [the defendant's] associate intimidate or threaten the informant." *Id.* The district court agreed that the Government's "interpretation was possible and reasonable, and thus admitted the recordings into evidence." *Id.* The Seventh Circuit agreed with the district court, noting that the district court "simply allowed the jury to choose from more than one reasonable interpretation, and then later made its own decision as to the most reasonable." *Id.*

¶ 88    The Seventh Circuit reasoned as follows:

"We agree with the district court that while [the defendant] did not explicitly instruct his associate to threaten the informant in the recordings, the jury could reasonably interpret the phone conversations in that manner. Thus, the trial court did not abuse its discretion in determining that the evidence was relevant. The only remaining question is whether its prejudicial effect outweighed its probative value.

We find the case law regarding the practice of requiring defendants to wear prison attire at trial to be distinguishable. We agree that [the defendant] may have been somewhat prejudiced by the fact that the jury learned that the calls were recorded while he was in jail. However, the occasional reference to the fact that [the defendant] had at some point been in jail is quite different than the 'constant reminder of the accused's condition implicit in

32

such distinctive, identifiable attire' that underlies the injustice inherent in requiring a defendant to stand trial in prison garb. See *Estelle v. Williams*, 425 U.S. 501, 504-05, 96 S. Ct. 1691, 1693, 48 L.Ed.2d 126 (1976). The Supreme Court has found that the defendant's prison attire is 'likely to be a continuing influence throughout the trial' and that requiring such attire during trial is thus likely to undermine the presumption of innocence and the defendant's right to a fair trial. *Id.* Given that [the defendant] faced a much[-]diminished form of prejudice, and that the district court had to weigh this prejudice against the probative nature of the recordings, we find that the court did not abuse its discretion in admitting the tapes." *Id.* at 821-22.

¶ 89 Similarly, in the present case, defendant and Schreier did not explicitly reference the shooting or the Motel 6 during their conversation. However, defendant stated that they "got that shit on camera," and Schreier responded, "you knew the hotel had cameras." We conclude that the jury could have reasonably interpreted the phone conversation to reference the shooting that had taken place at the Motel 6 two days prior to the phone call. Thus, we conclude that the trial court did not abuse its discretion by finding the jail phone call recording relevant.

¶ 90 Also, as in *Johnson*, we conclude that the probative value of the jail phone call recording was not substantially outweighed by the risk of undue prejudice to defendant. Again, we agree with the State that the case law defendant cites regarding defendant's wearing prison attire at trial is distinguishable from the jury hearing a phone call defendant made from jail. We, again, note that there was no visual depiction of defendant in handcuffs, shackles, or prison attire. Although defendant may have suffered some prejudice by the fact that the jury learned the phone calls were made from jail, we conclude that defendant "faced a much[-]diminished form of prejudice" in this case. *Id.* at 822. Because the trial court could have reasonably found that the probative value of the

33

jail phone call recording was not substantially outweighed by unfair prejudice to defendant, we conclude that the court did not abuse its discretion by admitting the jail phone call recording at defendant's trial.

¶ 91    For similar reasons, we reject defendant's argument that the trial court erred by permitting the jury to again view and hear the video and audio recordings of him in custody during deliberations. "[T]he trial court has the discretion to grant or deny the jury's request to review evidence." *People v. Hollahan*, 2020 IL 125091, ¶ 11 (citing *People v. Kliner*, 185 Ill. 2d 81, 163 (1998)). Here, the court did not abuse its discretion by allowing the jury to review properly admitted evidence during deliberations. Thus, defendant has failed to demonstrate that the court erred by overruling defense counsel's objection.

¶ 92                                C. Ineffective Assistance

¶ 93    Lastly, defendant argues that defense counsel provided ineffective assistance. Specifically, defendant argues that counsel provided ineffective assistance by failing to stipulate to his felon status, by failing to move to sever the unlawful possession charges from the aggravated discharge of a firearm charge, and by not objecting to Holsapple's improper lay opinions and identifications. The State responds that defendant failed to establish that defense counsel provided ineffective assistance where the cumulative weight of the evidence of defendant's guilt precludes him from establishing prejudice from counsel's alleged deficient performance. We agree with the State.

¶ 94    "In order to succeed on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's representation fell below an objective standard of reasonableness (deficiency prong) and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different (prejudice prong)." *People v. Boyd*, 2018 IL App (5th) 140556, ¶ 16 (citing *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)). "To establish deficiency under the

34

first prong of the *Strickland* test, an individual must overcome the strong presumption that the challenged action or inaction was the product of sound trial strategy." *Id.* ¶ 17 (citing *People v. Simms*, 192 Ill. 2d 348, 361 (2000)). "It is well settled there is a strong presumption that counsel's conduct falls within the wide range of professional assistance." *Id.* (citing *People v. Crutchfield*, 2015 IL App (5th) 120371, ¶ 34). To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "Both prongs under *Strickland* must be satisfied in order to succeed on a claim of ineffective assistance, and the failure to satisfy either prong will be fatal to the claim." *Boyd*, 2018 IL App (5th) 140556, ¶ 19 (citing *People v. Mack*, 2016 IL App (5th) 130294, ¶ 27). "Therefore, a court need not address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* (citing *People v. Ramos*, 339 Ill. App. 3d 891, 900 (2003)).

¶ 95    "Our supreme court has held that the prejudice prong for ineffective assistance of counsel is similar to the closely balanced evidence first prong of plain-error review." *People v. Taylor*, 2022 IL App (5th) 180192, ¶ 47 (citing *People v. White*, 2011 IL 109689, ¶ 133). "This is true because both analyses are evidence-dependent and result-oriented." *Id.* (citing *White*, 2011 IL 109689, ¶ 134).

¶ 96    Here, even assuming *arguendo* that defense counsel's performance was deficient, defendant failed to establish prejudice. As noted, the evidence against defendant was overwhelming. Notably, the video surveillance demonstrated that a Black male with long hair and red clothing fired shots at several individuals on the second-floor balcony of the Motel 6. The evidence demonstrated that the same man retreated into room 238 following the shooting and

35

reemerged shortly thereafter only to flee towards the north stairwell of the motel. The still frame photographs from the stairwell demonstrated that the same man was holding what appeared to be a gun as he fled the hotel. Schreier, defendant's girlfriend, testified that she was staying at the Motel 6 in room 238 in November 2021, and that defendant was at the motel on the date of the shooting. When police searched Schreier's hotel room, they found a black duffle bag that contained Blazer and Remington brand ammunition. Holsapple testified that the brand ammunition found in the duffle bag was the same brand as the shell casings law enforcement recovered from the second-floor balcony and surrounding area. Holsapple also testified that he did not believe the duffle bag belonged to Schreier. As this court previously concluded, the evidence, although circumstantial, was overwhelming against defendant. Specifically, we conclude that the video surveillance footage from the motel depicting the shooter wearing all red, coupled with the evidence showing that defendant was found at a nearby gym wearing all red, was overwhelming evidence of defendant's guilt.

¶ 97   Thus, defendant has failed to show that he would have been acquitted of the charges against him had counsel stipulated to his felon status, moved to sever the unlawful possession charges from the aggravated discharge of a firearm charge, and objected to Holsapple's testimony. Therefore, defendant failed to establish prejudice and his claim of ineffective assistance fails.

¶ 98   III. Conclusion

¶ 99   For the foregoing reasons, we affirm the judgment of the circuit court of Effingham County.

¶ 100   Affirmed.